This is 411-0142, Gillespie Community Unit School District No. 7, County Illinois v. Union Pacific Railroad. For the appellant is Mr. Berticchio, Rick Berticchio and Thomas Berticchio. Yes, good morning. Pardon? Good morning. Are you both going to be arguing? I'll be arguing. Okay, thank you counsel. For the appellee is John Michael Clear, you'll be doing the arguing sir. Okay, Mr. Berticchio you may proceed. Good morning, may it please the court. Good morning, counsel. Thomas Berticchio. Your honors, we're here this morning on the appellant Gillespie School District's petition for re-hearing regarding the court's affirming the trial court's dismissal of the school district's assumption of liability against the appellee, Union Pacific. There are only a few facts that need highlighting. Superior coal, mined coal beneath Bunnell, Illinois from 1903 to the mid-1950s, beneath an area where the school district would ultimately build an elementary school. In September of 1956, the Board of Directors of Chicago and Northwestern passed a resolution providing that it assumed any liabilities of superior coal. This court quoted the resolution in its opinion in October of this year on the appeal. The resolution I'm quoting from page 7, paragraph 15 of the court's October opinion states as follows, whereas this company has adopted a policy of reducing the number of its subsidiary corporations and in furtherance of that policy, it has been determined to be in the best interest of this company that the superior coal company, all of whose outstanding shares are owned by this company, be dissolved and that its assets be transferred to this company and that this company assume its liabilities in the event that such liabilities cannot be fully liquidated prior to the time the certificate of dissolution has been issued by the Secretary of State. Further resolved that this company assume any liabilities of superior coal company subject to applicable statutes or limitations that cannot be fully liquidated prior to the time the certificate of dissolution has been issued by the Secretary of State. That this company assume any liabilities of superior coal. What were the statutes or limitations being referred to in that phrase? Well, the statute of limitations could have been many. If we're specifically talking about subsidence, then the statute of limitations is the statute that begins to trigger on the occurrence of subsidence. The Illinois Supreme Court tells us that in the American West case, that with regard to subsidence, statute of limitation triggers upon subsidence. So with regard to claims before this court, the statute of limitations triggered in March 2009 when the subsidence occurred. In December of 1956, only a few months after the resolution was passed, Superior Coal transferred all of its assets in Macoupin County, all of its mineral rights, about 40,000 acres of mineral rights to Chicago and Northwestern. Superior Coal then dissolved in 1957. In 1970, Chicago and Northwestern sold all of its assets, all of its liabilities, to Northwestern Employee Transportation Corporation. The parties in this court refers to that company as New Chicago and Northwestern. In 1995, New Chicago and Northwestern merged with Union Pacific. And then in March 2009, subsidence then occurred and destroyed the school district's elementary school. This court, in its October order, recognized, quoting from paragraph 104, quote, in 1995, when the merger occurred, when New Chicago and Northwestern merged into Union Pacific, Union Pacific became responsible and liable for all liabilities and obligations of New Chicago and Northwestern. Now, the issue surrounding the assumption of liabilities claim that the school district brought is whether Chicago and Northwestern assumed liabilities in 1956, whether those liabilities included the subsidence liability relating to the school district's destroyed school. And if so, they passed to Union Pacific as a matter of law, pursuant to the merger, as this court stated in its opinion. The resolution in September 1956 that you made reference to earlier, and the reference therein to the statute of limitations, that provision came in effect 53 years later? Is that your position? That's the statute of limitations they were referring to 53 years after the fact? Well, they were referring to all statute of limitations. So it could have been 153 years after the fact, and litigation would then arise? It could have been, if it was a case where a statute of limitations triggered 150 years after the fact. It could have been a slip and fall at the property five years later. What was the purpose of putting that phrase in the resolution? We don't know the purpose of putting the phrase in the resolution. Whether it was a lawyer's belt and suspenders, we don't know. Go back to 1956 in the Wayback Machine, as they would say, and try to figure out why... We're construing a contract here, aren't we? We're construing a resolution that's acting as a contract, yes. Why did they do that? What were they attempting to achieve? You're an attorney sitting around the table. What would be the discussion? I think that they were attempting to achieve and remind everyone that we're assuming any liability. We're using a broad phrase. But let's make sure that there's nothing in this resolution that could lead someone to conclude that we waived statute of limitations on all claims, whether it be a slip and fall, whether it be some sort of product liability claim, whether it be a subsidence claim. And your point, Your Honor, leads to the question of, well, what did they mean? And if the decision of the court turns on what did they mean, because we can't really tell what they mean, then the trial court's decision on this issue must be reversed. We've cited you in the Goddard case that says when you're construing a document, if there's an ambiguity, if the liability relating to the document turns on an ambiguity, then the ambiguity must be resolved, not by the court, respectfully, not by this court, but by prior fact. Let me ask a two-part question. One, what would your position be if the phrase I've referred to about the statute of limitations weren't there? If everything else were there except for that, how would that change your position? And I guess maybe the second part just goes back to, why would they have put it in the first place? It wouldn't change my position. And the second answer is the same as before. I believe it was put in to remind everyone that we're not waiving statutes of limitations because there is language that is very broad. Any liabilities of superior code, and it's school district's request that any liabilities of superior code be construed exactly as that. Any means all. All is broad. All is as broad as you can be. The cases that we've cited to the court on the issue, we've cited the Philadelphia Electric Company case, the Ramos case, the Bibas case, the Kissinger case, the Girard case, the Iron Mountain Mines case. Every one of those cases, the courts hold that when someone, when an entity assumes all liabilities, that means, oddly enough, all liabilities. And if there is a desire from the parties to limit those liabilities, to narrow them in some fashion, each one of those courts hold that you must include limiting language. And if you don't include limiting language, then any liabilities means any liabilities. And we know that from those cases. So in the resolution, when they use the phrase, any liabilities of superior code, those cases tell us that that language includes not only presently existing liabilities, but inchoate liabilities, unaccrued liabilities. Liabilities such as a subsidence event that occurs down the road, and that it was 40 years, 50 years, 60 years, respectfully, doesn't matter. It's as if superior code were still around, Your Honor. 60 years later, there's a subsidence. No one would question that under the law of this state, as explained and outlined by the court in its October opinion, under the law of this state, subsidence liability exists. Now our case is different because they're not around, but before they were dissolved, they assigned, or rather, Chicago Northwestern assumed all of those liabilities. And they triggered in 2009. They still exist, and the law of this state is that subsidence liability, absolute and strict upon triggering, and that's what happened. And we know from the cases that we cited that any liabilities includes these inchoate, unaccrued liabilities. But we also know it from another area of the court's October opinion, because when the court was explaining how the liabilities for alter ego and direct participation ultimately passed to Union Pacific, other claims of the school district, claims that the court reversed the dismissal. There's another clause that exists in the resolution. Speaking of liabilities that cannot be fully liquidated prior to the time limit, Certificate of Dissolution has been issued by the Secretary of State. Does that have any application here? I think it does. The language that they used there, particularly given that it was a coal mine, given that in Illinois people knew that liabilities would trigger upon subsidence, they could have used language that said, have not been liquidated. Claims that existed, had accrued, had triggered, but had not been liquidated. But they used language, cannot, could not be liquidated. That is perfectly aligned with the concept of subsidence liability, because a subsidence liability most certainly could not be liquidated until it triggered. Because only then, as the court pointed out, does the liability actually attach, even though it exists in an unapproved way. So if it cannot be liquidated, it fits perfectly with the notion that we're assuming the liabilities of a coal mine. Liabilities that include subsidence liability. Subsidence liabilities may trigger next year, 10 years, 30 years, 40 years. So that language fits perfectly. So when the court concluded, and when it affirmed the trial court's dismissal of the assumption of liabilities, this court concluded that it was impossible, it was impossible for Chicago and Northwestern to assume those liabilities because they did not get accrued, they were encoded. The cases we cited in the petition for re-hearing tell us that the court was mistaken in that analysis. Because entities do that all the time. They assume NCOA unapproved liabilities all the time. They're an assumption of any liabilities. Why do they do that? They do it as part of a transaction. Whether they do it because that's what the seller demanded, whether they do it because that was the price that was bargained for. For example, we know that when old Chicago and Northwestern sold its assets and liabilities to new Chicago and Northwestern in 1970, that the language included an assumption of any liabilities. The language in the court quoted in its October opinion. Known, unknown. Approved, unapproved. It certainly would have been better off for new Chicago and Northwestern not to take those liabilities. I don't want them. But that was part of the deal. And in this case, with regard to the assumption of liabilities claim, Chicago and Northwestern, when they passed the resolution, they passed the resolution and they selected language as broad as possible. We assume, quote, any liabilities of superior quality. No restrictions. None whatsoever. And then adding that cannot be liquidated prior to issuing the certificate only makes it clear that we're talking about subsidence. But if it's not clear, then it's ambiguous. And if it's ambiguous, then the trial court's order must also be reversed. Because as the court stated in the Goddard case, quote, if an ambiguity exists, then the interpretation of the document is a question of fact, which cannot be resolved by a section 2615 motion. Rather, the question can only be resolved after a trial on the merits. So the decision of this court with regard to the assumption of liabilities was mistaken on two counts. One, it was not impossible to assume later triggers besides liability. We know that in the case that's cited. We know that from the 1970 transaction. Superior Co. was a wholly owned subsidiary in 1956, wasn't it? Wholly owned by Chicago and Northwestern, correct. So this was a resolution of the board of directors of Chicago and Northwestern to take over Superior Co.? In effect, yes. And the preamble to the resolution that the court quoted says that clearly, says it plainly, that it's a decision of Chicago and Northwestern. The company has adopted a policy, the company being Chicago and Northwestern, of reducing the number of its subsidiary corporations. That's why they were passing the resolution. The notion that Union Pacific offers to this court that they were passing this resolution as part of the dissolution process required by the state of Illinois isn't so at all. How do we know that?  Who was negotiating on their behalf? Well, Chicago and Northwestern and Superior Co.? in 1956 were one and the same. They were wholly owned, alter ego relationships. I can't say that they were negotiating for Superior Co.? That's what I mean. Then why would Chicago and Northwestern, upon taking over Superior Co.? burden itself with this language about taking on their liabilities when it's not as if the people from Superior Co.? were forcing this as part of negotiation. They weren't an independent entity. No question about it. So what's going on? That's an excellent question, Your Honor. And the truth of the matter is we don't know why. There's been no discovery on the issue that's been allowed in the case given the 2-6-15 dismissal. But we do know why not. We know that it wasn't part of Superior Co.?'s dissolution because there's nothing in the statute that required the parent company to pass this kind of resolution when a subsidiary was dissolving it. That's the subsidiary's job. The parent was not obligated to do that. We know it wasn't part of the resolution. So to be clear, Chicago and Northwestern could have gone through this entire process without any reference to assuming liabilities, and no one from Superior was going to object because they were all under the control of Chicago and Northwestern. Isn't that correct? I would agree with that. I would agree with that. But we also know that Chicago and Northwestern planned to take all the assets of Superior Co.? We also know that that, in fact, happened a few months later and 40,000 acres of mineral rights were transferred from Chicago and Northwestern to Superior Co.? I'm sorry, thank you, Your Honor. 40,000 acres of mineral rights were transferred from Superior Co.? to Chicago and Northwestern. We also know that that had significant value. Whether the assumption of liabilities then related to increasing the basis upon the transfer, we don't know. It's certainly possible. We also know, and these documents were discussed and briefed in the original appeal report. Well, counsel, I want to fire up the Wayback Machine once more, and I want you to be sitting there as this young associate lawyer for the Chicago and Northwestern folks. You're involved in this M&A transaction here, and someone says, Well, Tom, how does this proposed resolution look to you? Are you going to raise any question about the assumption of liabilities language, about why would we want to be doing that to ourselves? I think the question I would raise is, let's recognize that we are doing that, and let's make sure that we have a reason that we're doing it. Then, of course, one of the bosses who's not a lawyer says, Why is this language in here? Why do we want to do this to our company? And you'd say, Well, I'd say that the plan is that we're taking all the assets of this company. And if we're taking all those assets, then liabilities could naturally follow. And that's what they don't have to. Do we have to include liabilities? And you'd say no. And then he'd say, Well, why do we do this then? And I would say because if we're talking about, again, Your Honor, we haven't had the privilege of discovery on the issue. Well, I don't know who you're going to discover from 1956. Well, I believe we're going to discover documents from Chicago and Northwestern. We're going to discover file memos to the associate that is in the Wayback Machine that he may have written in 1956. We're going to discover all of that. And at the end of the day, the why question, which is a plaguing question, admittedly, the why question, is not part of the claim. The claim doesn't require the answer to why. Well, you don't have to prove why, but the reason I ask why is I'm wondering if that should help to inform the question of what. What does it mean? Absolutely. And that brings us full circle to an ambiguity. If we in this room are struggling with what does it mean, then discovery should be undertaken. Those filed memos should be uncovered. And the prior fact will make the decision of what does it mean. Did any liabilities of superior gold really mean any liabilities? And the case law tells us that that's an issue for the jury. Your Honor, we respectfully request that the petition for re-hearing be appropriately granted and that the trial court be reversed on its decision to dismiss Act 5 of the school district's complaint, the assumption of liabilities. Thank you, Counselor. Mr. Clear? Thank you, Your Honor. Am I pronouncing your name correctly, sir? You are. I'd like to guess. Well, you really can't believe the way that name gets mangled. It is too simple. Why the Y got lost at Ellis Island, I can't explain. You mean it was Cleary originally? Cleary originally, we believe. There are still five Clears in the all-Irish phone book, but we're a distinct minority. Cleary's are more popular. Your Honor, I don't think there is a mystery here at all. I don't think there's a mystery as to what your opinion really says. I don't think there's a mystery as to what the CNW board in 1956, and I remember 1956, as to what they thought they were doing when they passed that resolution. As to the sole issue under consideration, we believe you arrived at the right conclusion. The CNW did not assume these liabilities, which did not exist, for 53 years. I think the reading of your opinion that suggests that you had some sweeping holding, that it is legally impossible for an entity to in fact do that, misreads the opinion. I think there are probably two stray words, could not, on page 22, and I think that the caption of that section, which refers to legal impossibility, I can't say that their attempt to read that into your opinion is altogether unfair, but I think it's wrong. I don't think that's what you said. I think you said they didn't do it, not that they couldn't do it. And I say that because you began with the absolute correct legal premise. In an asset acquisition of this type, the parties involved can define what liabilities are and are not assumed. You say that, you cite two prior cases, they conceded it at multiple points in the prior proceedings, that's the law. There is absolutely no quarrel today that that is the law. And the question is, what was the intent at the time? And this effort to make this seem much more mysterious than it is, I think is actually betrayed by the way in which Mr. Verticchio did finally answer your question, as to why did they stick in this reference to statute of limitations? He said because they didn't want to waive any. Didn't want to waive any. He said it twice. But he's asking you to, in fact, conclude that there is an implicit intent to waive, frankly, the all-important statute of limitations, the binding bar on any claims against dissolved entities after two years after dissolution. That was the statute in effect in 1956. Today it is five years. And that statute has been given strict reading for the more than 60 years it has been on the books. It's a derogation of common law. In ancient England and in early America, when a company dissolved, all debts were extinguished like that. There was no provision for taking care of debts after the dissolution. So that various states adopted statutes that prescribed a dissolution process that had a core requirement that there be an orderly winding up of the affairs of the entity and that all outstanding debts for a certain period of time be discharged or provision made for it. Those are the magic words. And the question as to what the CNW Board understood is no mystery at all. If you look at Exhibit 10, the plaintiff's complaint, this is the Certificate Articles of Dissolution prescribed by Illinois law, which the Board signed off on. And one of the elements of that requirement is that they certify that provision had been made for the liabilities of the dissolved entity for the period that is the two-year period at that point. They had to certify that in fact provision had been made for those debts. And we know because we introduced the evidence below without objection that the way they did that was they created a reserve to cover liabilities during that period. And once all those liabilities were discharged, the reserve was extinguished. So there's absolutely no mystery that the Board understood what the dissolution process entailed. They understood what they had to certify to the state, as to which I guess my answer would be it is true that there was no one on the other side of the table representing Superior Coal, but there was someone representing the state because there was a requirement that there be orderly dissolution and provision for debts for a certain period of time. And the law is clear that once that time ran, there is no obligation on anybody's part. So what you're being asked to read into this resolution is that these Board members, in breach of their fiduciary duty, decided to accept unlimited perpetual liability when they had the legal right to not do so. And they say that's the equally plausible interpretation of this resolution. Well, I say that's nonsense. I say they wrote in subject to the applicable statute of limitations because they meant it. Is that a mysterious term? Do we really not think we know a statute of limitations when we meet one? Well, at pages 21 to 23 of our opening brief, we went through a lengthy exegesis as to all the ways in which the term statute of limitations has been construed under Illinois law. We cited to you a variety of cases that characterized the statute we're talking about as one of limiting claims. We cited to you the authoritative bar roster of statutes of limitations. Illinois has over 215 statutes of limitations, and they're all over the place. The reason the Board does this is because, frankly, it's a trap for the unwary to not have a comprehensive listing of all of these statutes. Number four in the most recent book was the statute we are talking about here today. The official draftsman of the Illinois rules commented that this was, in fact, a statute of limitations. And finally, we resorted to my 1969 edition of Random House Dictionary that happened to be on my shelf. It says a statute of limitations is a statute that limits claims. So applying the settled, familiar canons of construction, taking the words in their ordinary meaning, we say the C&W understood exactly what it was doing. And it was invoking the full protections it was entitled to under the law. And that not only includes the statutes otherwise applicable to torts and contracts, but the statute applicable to claims against a dissolved entity. What about the argument that the statute of limitations is a term of art and limited? I say that that is not... First, there's no factual basis to suggest that this Board had any such hyper-technical intent. And remember, in a fact-pleading state, it is the plaintiff's duty to plead facts that establish the ambiguity. They can't just want to argue about a word. They've got to plead facts that suggest to you that, in fact, this Board had that intent. And, of course, there's no allegation that the Board had ever heard of that 1934 case that had used that construction, much less that it anticipated 50 years later that that would be in relatively regular use, including by this Court in your SAP decision. I don't dispute that courts have had to explain why they are not permitting the customary constraints on statutes of limitations, that they do it by distinguishing between a survival statute or a statute of opposed versus a statute of limitations. But none of those cases say that to suggest that a generic reference, the statute of limitations, necessarily excludes, for example, Section 94. As I've said to you, both the language of the opinions, the bar itself, and the authors of the rules have all seen this as a statute of limitations. So it's just not me saying this to you. There are quite a few people who agree with me. But I also come back to the principle that if a party wants to create ambiguity and say, oh, we want to do years of discovery and have a trial, they have to plead some facts that suggest to you that the ambiguity is real. They have pleaded nothing. And they've admitted to you they can offer you no explanation as to why this board would want to do that. And as you know, courts actually sometimes apply common sense in looking at these situations. Only when it can't be avoided. I'm not saying I can give you a notebook full of those cases, but I've seen some. And the fact is courts ask that question with some frequency. One of the cases they cited to you, the trust case, asks the question, well, what did the settler wish for his beneficiaries? In the one case they cited where the court did find ambiguity, the court said we find language that suggests two different things. The first, that this trustee should hold on to this stock forever. The second, the trustee should be free to act. We find language in the trust instrument that says that the trustee is to apply his good judgment as to what's in the interest of the beneficiaries. So the court said in that case where we actually see two different equally plausible alternatives, we think that is legal ambiguity. And we do think further proceedings are required. But if you contrast that to what we are dealing with here today, first note, they have no facts at all. They have the text of the resolution. Period. Nothing else. And they say to you that it's an equally plausible interpretation that this board, knowing they could cut liability off after two years, chose not to. Chose to take it on forever, unlimited. I don't think that washes. I don't think it passes the common sense test. Regarding the paragraph that I cited to Mr. Verticchio, the two phrases there, statute of limitations that cannot be fully liquidated, et cetera, what is your position on how it should be construed and what they meant? It is echoing the dissolution statute. It is referring back to what must be covered. So this is a reflection of the two-year statute that was governing liabilities of dissolved corporations? Yes, sir. But if that's by operation of law, why did they have to make any reference to it at all? I'm not sure they did. Well, in fact, if I understand you correctly, you're pretty sure they did not have to. Your Honor, and I will tell you, I think this is reflected. In an earlier life I was a railroad lawyer. And I will tell you there are no more careful types that I ever encountered. Railroad lawyers, I mean, I actually never wore belts and suspenders, even when I had buttons in the pants. I will tell you railroad lawyers are very big on belts and suspenders. I actually think this could have been drafted simply saying, we're going to accept the liabilities of superior coal as defined by law. And as defined by law would mean they die after two years. And that's another way of actually saying the same thing. This was not an adoption of any liabilities, but it was of superior coal liabilities. Let me pause right there. If it's true that as a matter of law there is this two-year period for which liabilities of superior coal would continue and Northwestern would be responsible for those, then it's also true that because of the operation of law  and then the question comes, if they chose to mention something about it in the resolution, why is it in Mr. Berticchio's right that they had something else in mind? Well, of course, we're piling speculation on speculation to a certain extent. Oh, look at the last one. The first two I think are pretty clear. Namely, they didn't have to say anything at all. But actually, Your Honor, they had to say something because they were going to start paying claims asserted against superior coal out of CNW reserves. But they'd have to do that, I thought you pointed out, as a matter of operation of law under the Illinois statute. They do. It's a public company. You still have to, in fact, record it, memorialize it, and establish as a matter of gap why you are, in fact, paying these claims for this other entity. Unfortunately, with public company law, you can't just start doing things. You have to have the process in place and you have to document what it is you think you're doing. And that's the significance, we think, of the many different board documents that reflect how carefully this process was followed through. So I don't think that resolution, in fact, was surplusage in that sense. It was careful. It was lawyered. It was worded precisely. It meant what it said. But it was not a foolish thing to have each of these steps documented because step one was to declare they planned to dissolve it. Step two was to, in fact, plan how the dissolution was to occur. Step three was to make provision for superior cold liabilities, which they did by establishing a reserve. And step four would be to then, in fact, discharge all those liabilities that were legally valid. And it ended after two years. Actually, it did if the Edwards plaintiff's claims were filed late. What about Mr. Reticchio's argument? He says, well, if there's any ambiguity, then it needs to go to trial to be resolved. The problem is you've got to start with the premise, what's the ambiguity? You're going to go to trial about what the statute of limitations means? They have no other factual. He told you the truth at the very beginning of his argument, that he is only a fact. There is this resolution. There is no other ancillary background or contextual fact offered to you to establish the ambiguity. He just wants to debate the words. He wants to debate it based not on what the text says, but on how other courts have characterized that statute at other times. It doesn't have a blessed thing to do with what the board intended when it adopted that resolution. And as I say, I was actually quite struck by the way Mr. Reticchio finally acknowledged to you that he reads into this a goal to waive nothing. And yet he's arguing to you basically they want to waive everything, that the most valid, strong protection that they had available to them, which was this absolute two-year bar, which the cases have consistently enforced as written, including this court twice, in SAP and in Vance, this court said the statute means what it says. Even if we're real sympathetic to the claim, even if we recognize it means meritorious claims are going to go unremitied, that's for the legislature to decide. They have to make a balance between the competing interests, and they did it, and they said it unambiguously, and we're going to enforce it. Knowing all of that, where is the ambiguity as to whether this board, 1956 businessmen, would choose perpetual risk as opposed to certain safety? That is not trial worthy. Thank you, counsel. Mr. Reticchio. I'll try to hit Mr. Clear's points. Mr. Clear just told you, well, it's the survival statute. That's what they meant. That's the singular thing they meant when they put statutes of limitation. But we know that can't be true unless these folks were exceedingly sloppy. They said statutes of limitation. It cannot simply be the survival statute. It can't be that. We know that. Belts and suspenders. Mr. Clear says, well, this is belts and suspenders. They could have just said as defined by law. But it continues, Union Pacific continues to go down this slippery slope of assuming that Chicago and Northwestern had to do this. We heard it time and time again over the last few minutes. Chicago and Northwestern had to, there were four steps. Step one, step two, step three, step four, Chicago and Northwestern. That wasn't the case. Chicago and Northwestern had to do nothing. The statute requires, and requires, the dissolving entity, the dissolving entity, Superior Court, to provide for debts and obligations for this period of time. It can do that through, I suppose, its parent being willing to do so. It can do that through setting up a bond. It can do that through setting up insurance. It can do that through setting up an account that could be drawn upon. That was Superior Court's obligation. Chicago and Northwestern had to do nothing, but did. It passed an unrelated resolution, unrelated to the dissolution, and provided that it was going to get all of the assets and it was going to assume all of the liabilities. Well, counsel, let me go back to the question, to an answer you gave earlier that Mr. Clair pointed out, and I had been wondering about when you gave it, and that was what would this purpose of this language be in there, and I understood you correctly. You said, so as not to waive the statute of limitations, but it seems like that's the answer is 180 degrees opposite. Well. That by putting it in there, they have waived the statute of limitations for in perpetuity, as Mr. Clair argues, and indeed as you conceded in my very first questions. This could be 100 years from now that the liability would arise, and according to your interpretation, you're stuck, Union Pacific. Is that right? Absolutely. Absolutely. I don't understand how that can be. I can't. It seems to me if we're to construe a document as an ambiguity, as to say, well, it could mean this and that, there ought to be some articulable basis that after all this time you could provide on why Northwestern would do that, and I still haven't heard it. Well, I go back to there's two things. One, it was taking and it did take all of the assets, and it could very well be that when it did so, it elected to take the liabilities. Why? Because it increased their basis in the asset by taking the liabilities that flowed with them. It increased their basis from a financial standpoint, and when it came time to getting rid of those assets, its basis would have been higher, and that's why for tax planning purposes it took the liabilities with the assets. It could be we know, and this was briefed to the court, we know that there was a merger plan. We know there was a merger plan. There were documents evidencing a merger between, or would be a merger between Chicago and Northwestern and Superior Coal. It could be that they took the assets and liabilities as a precursor to the merger because we know, as the court has cited in its opinion, that upon merger the assets and liabilities flow as a matter of law. It could be that they acknowledged and they knew that the alter ego relationship existed. They had, in fact, requested the Illinois Supreme Court to find an alter ego relationship. They knew it existed, and they took the assets and liabilities and furthered and severed that relationship because by the resolution's very words, they said,  We're going to take the assets. We're going to assume any liabilities. We also know that when it said statutes of limitation, it wasn't referring to the Survival Act. Now, Union Pacific, what do they give you? They give you bar guides and a 1969 Random House Dictionary. Well, they've got dozens of statutes of limitations all over the statutes, don't they? No question, and the law in this case...  It is a term of art. As a term of art, what does that mean? Well, we know that it means limiting claims by time, but we know from the courts of this state, including the Sapp case, the Canadian Ace case, the Illinois Supreme Court case in Parker, the Morris case, they all say that statutes of limitations and the Survival Act differ. Here's what a Canadian Ace said. Illinois courts have made clear that Section 94 is a survival statute rather than a statute of limitations. It must be emphasized that the corporate extension statute is not a statute of limitations. When was that written? That was written in 1978. Parker said, this is the Illinois Supreme Court, relying on a 1934 Illinois Supreme Court opinion, says the Survival Act appears to be a survival statute rather than a statute of limitations. And the Illinois Supreme Court just reminded us last year in the Earth Foods case when the issue was, can you subsume guarantor into sureties? Can you construe one to be both? And the Illinois Supreme Court said, no, the history in this state is that sureties are different from guarantors, and because of that, you can't read one into the other. The exact same thing applies here. The Illinois Supreme Court, as far back as 1934, says that statute of limitations and Survival Acts are different. Following Earth Foods, you can't read them together. And if you're so inclined, at best, there's an ambiguity. Thank you, counsel. We take this matter under advisement and deem it recess. Thank you.